**IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE**

**AT KNOXVILLE**

**JULY SESSION, 1997**

FILED

November 26, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 03C01-9611-CR-00408** |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | **KNOX COUNTY** |
| **VS.** | ) | |
| | ) | **HON. MARY BETH LEIBOWITZ** |
| **CHRISTA GAIL PIKE,** | ) | **JUDGE** |
| | ) | |
| Appellant. | ) | (First Degree Murder-Death Penalty) |

**ON APPEAL FROM THE JUDGMENT OF THE
CRIMINAL COURT OF KNOX COUNTY**

FOR THE APPELLANT:

WILLIAM C. TALMAN
P.O. Box 506
Knoxville, TN 37901-0506

JULIE A. MARTIN
P.O. Box 426
Knoxville, TN 37901-0426

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General and Reporter

KATHY MORANTE
Assistant Attorney General
425 5th Avenue North
Nashville, TN 37243

RANDALL E. NICHOLS
District Attorney General

WILLIAM CRABTREE
S. JO HELM
Assistant District Attorneys General
City-County Building
Knoxville, TN 37902

OPINION FILED _____

AFFIRMED

DAVID H. WELLES, JUDGE

# OPINION

In this capital case, the Defendant, Christa Gail Pike, was convicted of first degree murder and conspiracy to commit first degree murder. After the sentencing hearing, the jury found two aggravating circumstances: (1) That the murder was extremely heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; and (2) that the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the Defendant or another. Tenn. Code Ann. § 39-13-204(i)(5) and (6). The jury found that the State had proven beyond a reasonable doubt that the aggravating circumstances outweighed any mitigating circumstances and sentenced the Defendant to death by electrocution. The Defendant was also sentenced to a consecutive sentence of twenty-five (25) years for the conspiracy to commit first degree murder conviction.

On appeal, the Defendant raises the following issues for our review:

>(1) Whether the evidence was sufficient to support the verdict of first degree murder and conspiracy to commit first degree murder and the sentence of death;

>(2) whether the trial court erred by refusing to prohibit the news media from covering pretrial proceedings;

>(3) whether the trial court erred by refusing to grant the Defendant's motion for a change of venue;

>(4) whether the trial court erred by failing to allow the Defendant to select a jury composed of a cross-section of the citizens of Tennessee;

>(5) whether the trial court erred by allowing the skull of the victim into evidence;

>(6) whether death by electrocution is cruel and unusual punishment under the federal and state constitutions;

(7) whether the trial court erred in allowing the state and the Defendant the same number of peremptory challenges; and

(8) whether the trial court erred in its sentencing on the conspiracy to commit first degree murder conviction.

After a review of the record, we affirm both the convictions and the sentence of death.

## BACKGROUND

On January 13, 1995, N. Duncan Whitaker Sutherland, an employee of the University of Tennessee Grounds Department, discovered the semi-nude, slashed and badly beaten body of a young female near the greenhouses on the agricultural campus. He immediately notified officials.

Officers from the Knoxville Police Department and the U.T. Police Department were summoned to the scene. Officer John Terry Johnson testified at trial that the body he found was lying face down on debris and was nude from the waist up. Blood and dirt covered the body and remaining clothing, and it was apparent that the victim's head had been bludgeoned. Multiple cuts and slashes appeared on the torso. Officer Johnson stated that he thought he was looking at the victim's face but he could not be sure because it was extremely mutilated.

As other officers arrived, they began securing the crime area. The area of the crime scene tripled as officers discovered other spots of blood, articles of clothing, footprints, and broken foliage. When officers turned the body over, it appeared that the victim's throat had been slashed. A rag was around the victim's neck. Detective Donald R. Cook, of the U.T. Police Department,

accompanied the body to the morgue, and he testified at trial that after the body was cleaned, it was apparent that a design resembling a pentagram had been carved in the victim's chest.

Dr. Sandra Elkins, the Knox County Medical Examiner, testified at trial that she had performed the autopsy on the victim, who was later identified by dental records as Colleen Slemmer. She testified that after removing the victim's clothing and cleaning the body, she had started with the torso to document major sharp force or slash and stab wounds. If it was a fairly major wound, she would measure it and assign it a letter. Utilizing a chart to demonstrate her findings, Dr. Elkins described each major wound, later explaining that at some point it became obvious that if she labeled each wound, she would have to go through the alphabet again, and unless she "wanted to stay there for three days," she "basically threw up [her] hands and just said, enumerable [sic] more superficial slash wounds on the back, arms and chest."

Dr. Elkins noted numerous slash and stab wounds on the back, arms, abdomen, and chest. She described a six inch gaping wound across the middle of the victim's neck which had penetrated the fat and muscles of the neck and stated that she had found ten additional slash wounds on the victim's neck and in the throat area. Other slash wounds were on the victim's face and it appeared that a pentagram had been carved on her chest. Dr. Elkins repeatedly stated that throughout the infliction of each of these injuries, she was medically certain that the victim had been alive because of the vital reaction appearing around each wound. She stated that the area around each wound was red in appearance, indicating that the heart had still been beating when the wound was inflicted. She

-4-

also testified that none of the aforementioned wounds would have rendered the victim unconscious.

Dr. Elkins testified that the cause of death was blunt force injuries to the head. She stated that the skull showed a minimum of four blows to the head; two to the left side of the head, one over the right eye, and one in the nose area. The right frontal area of the skull had been fractured as had the bridge of the nose. However, the major wound, labeled as injury "W", involved most of the left side of the head. Dr. Elkins determined that this injury, caused by a blunt blow to the left side of the head, had fractured the right side of the skull and imbedded part of the skull in the victim's brain. She also found small divots in the skull containing black particles from an asphalt chunk which was later determined to have been used to administer the blows.

During this portion of her testimony, Dr. Elkins was allowed to use the victim's skull to describe the injuries. She testified that in order to determine the cause of death, it was necessary to remove the head of the victim and have the skull prepared by Dr. Murray Marks, a forensic anthropologist at the University of Tennessee. She explained that she had cut the top portion of the skull in order to remove the brain and when she had removed the brain, she discovered that loose pieces of skull were driven into it. She testified that at that time it seemed there was a larger hole in the skull than the pieces she had removed from the brain would fill. Dr. Marks had pieced together those loose portions of the skull and had fitted them into the left side area of the head. Dr. Elkins then showed the jury a piece of skull that had been given to her the Friday before the trial and demonstrated that it fit perfectly into the rest of the skull. The skull, numerous photographs, and items of the victim's clothing were introduced into evidence.

Robert A. Pollock, the orientation specialist at Knoxville Job Corps, testified that he had spoken with the Defendant on January 13, 1995, concerning a misplaced I.D. card. He stated that after the Defendant had left, he noticed a black leather jacket hanging on the chair where she had sat. He testified that he had locked the room at approximately 4:00 p.m. that day and did not return until 7:30 a.m., January 17. He stated that on the 17th, he found the jacket still hanging on the chair and took it to the Job Corps' Safety and Security Captain, William Hudson. Hudson testified that he had called the Knoxville Police Department and that Officer Arthur Bohanan had picked up the jacket.

Officer Bohanan identified the coat, and it was introduced into evidence. He testified that he had discovered a small piece of bone in the inside pocket of the coat and had immediately taken it to Dr. Marks at the University of Tennessee. Dr. Marks testified concerning the process by which the skull had been prepared and again demonstrated that the bone fragment given to him by Officer Bohanan fit perfectly into the bone reconstruction of the skull of the victim.

Kim Iloilo, a Job Corps resident/student and friend of the Defendant, testified that the Defendant told her on January 11, 1995, the day before the murder, that she was going to kill Colleen Slemmer because "she just felt mean that day." The following day, the Defendant met Iloilo in the parking lot at approximately 4:00 p.m. and told her that she needed to find Shadolla Peterson. Later that evening, at approximately 8:00 p.m., Iloilo saw the Defendant leave the Job Corps Center with the victim, Tadaryl Shipp, and Shadolla Peterson. She saw Shipp return to the Center at approximately 10:15 p.m. The Defendant and Peterson returned five minutes later.

Iloilo testified that the Defendant then came to her room to tell her that she had just killed Colleen Slemmer. The Defendant showed Iloilo a piece of Slemmer's skull she had kept as a souvenir. The Defendant told Iloilo that she had cut Slemmer's throat, had beaten her, and had thrown pieces of asphalt at her head. The Defendant stated that as she was cutting Slemmer's throat, Slemmer was asking her to stop, but that she continued to cut her throat because "she kept talking." Iloilo stated that as the Defendant described hitting Slemmer in the head with a piece of asphalt and carving a pentagram in her chest, she danced around in a circle, smiling and singing. Iloilo testified that at breakfast the next morning, Iloilo asked the Defendant about the piece of skull and the Defendant told her it was in her pocket, stating "And, yes, I'm eating breakfast with it." Iloilo identified the black jacket that had previously been introduced into evidence as one similar to a jacket the victim often wore.

On cross-examination, Iloilo admitted that she did nothing when the Defendant told her of her intention to kill Slemmer because she had just "blown [it] off as soon as it was said." She testified that she had never seen the Defendant fight with anyone else.

Stephanie Leigh Wilson, another resident/student at the Job Corps Center, testified that on January 13, 1995, she had been in class with the Defendant when the Defendant told her to look at the Defendant's shoes, stating, "That ain't mud on my shoes. That's blood." Wilson stated that the Defendant then showed her a piece of human skull and told her that she had slashed Slemmer's throat and had beaten her in the head with a rock. On cross-examination, Wilson admitted that in a prior statement to police officers, she had stated that the Defendant told her that the killing "had been a spur of the moment thing."

Randy York, a criminal investigator with the Knoxville Police Department, testified that he had been assigned this case on January 13, 1995. He testified that on the following day, he interviewed the Defendant and Tadaryl Shipp at the Police Department and that he had informed them of their rights and had taken a statement from the Defendant. He stated that the Defendant explained in detail how the killing had occurred and told him that the blood-stained jeans she had worn during the incident were still in her room. She also told Officer York that she had discarded two pieces of I.D. of the victim and the victim's black gloves in a trash can at a Texaco station on Cumberland Avenue. The Defendant gave consent to search her room and then went with York back to the Job Corps Center. From there the Defendant retraced her steps, describing what had occurred on the night of the killing. She eventually took Officer York to the exact location where the body was found. The Defendant later gave a tape-recorded statement, which was transcribed in some forty-six (46) pages. Copies of the transcription were given to the jury, and the jurors were allowed to listen to the tape through individual headphones.

In her statement made to Officer York, the Defendant stated that she and Slemmer had been having problems for some time. She recounted an incident whereby she had awakened one night to find Slemmer standing over her with a box cutter. She stated that Slemmer had been "trying to get [her] boyfriend" and had been "running her mouth" everywhere. She stated that on the night of the killing, she had planned only to fight Slemmer and let her know "to leave me the hell alone."

According to the Defendant, she asked Slemmer to accompany her to Blockbuster Music Store, and as they were walking, the Defendant told Slemmer

that she had a bag of "weed" hidden in Tyson Park. The group (the Defendant refused to name other parties who were involved in the incident) smoked marijuana and began walking toward the U.T. campus. Upon arriving at the steam plant on U.T.'s agricultural campus, the Defendant and Slemmer exchanged words. The Defendant then began hitting Slemmer and banging her head on the Defendant's knee. She threw Slemmer on the ground and kicked her repeatedly. According to the Defendant, as she slammed Slemmer's head into concrete, Slemmer kept asking, "Why are you doing this to me?" The Defendant continued to kick Slemmer in the face and in her side as Slemmer cried.

The Defendant and another person held the victim down and dragged her to another area where the Defendant cut her with a box cutter. The Defendant stated that as Slemmer screamed, she began to hear voices telling her that Slemmer would tell on her and that she would go to prison for attempted murder. Slemmer attempted to get up and the Defendant cut her on the back. The Defendant stated that Slemmer kept trying to get up and run, telling the Defendant that if she would just let her go she would walk back to her home in Florida. The Defendant told her to "shut up" because it "was harder to hurt somebody when they're talking to you." The Defendant stated that the more Slemmer talked, the more the Defendant kicked her.

Slemmer asked the Defendant what she was going to do to her, and the Defendant thought she heard something. The Defendant left the scene to check out the surrounding area to make sure no one was around. When she returned, the Defendant began cutting Slemmer across the throat. When Slemmer

continued to talk, the Defendant cut her throat more. The Defendant stated that the episode lasted "for about thirty minutes to an hour."

Slemmer attempted to run again, and the Defendant threw a rock which hit Slemmer in the back of the head. She stated that "the other person" also hit Slemmer in the head with a rock. The Defendant continued to hit her and then asked her, "Colleen, do you know who's doing this to you?," but according to the Defendant, Slemmer only made groaning noises. The Defendant and the other person washed their hands and shoes in a mud puddle. They discarded the box cutter and the miniature meat cleaver that had been used in the incident. The Defendant described dragging Slemmer to some nearby trees and leaving her clothes in the bushes. After the Defendant's statement was played for the jury, pictures of the Defendant and Tadaryl Shipp, each of them wearing a necklace in the shape of a pentagram, were introduced into evidence.

Mark A. Waggoner, an officer with the Knoxville Police Department, testified that he had been dispatched to a Texaco Station on Cumberland Avenue where he retrieved a pair of black gloves and two of Slemmer's I.D. cards. These items were also made exhibits. Another officer, Lanny Janeway, used a chart to illustrate each of the locations where blood or evidence was found. Photographs of bloody chunks of asphalt, blood drippings on leaves, and pools of blood were introduced into evidence. The bloody piece of asphalt and the victim's bloody clothing were also introduced into evidence.

Special Agent Raymond A. DePriest, a forensic scientist employed by the Tennessee Bureau of Investigation, testified that he had received blood samples taken from the shoes and clothing of the Defendant and Shipp. Those items that

he determined had human blood on them were sent to the DNA unit. Margaret Bush, an employee of the Tennessee Bureau of Investigation assigned to the DNA unit, testified that the shoes of the Defendant and Shipp contained an insufficient amount of DNA for analysis but that the blood on the clothing of both had matched the DNA profile of the victim. She stated that there was a 1 in 200,147 chance in the Caucasian community that there would be such a match and a 1 in 600,018 chance in the African-American community. The state rested its case.

Dr. Eric Engum, a psychologist retained by the Defendant, testified for the defense that he had conducted a clinical interview and had administered a battery of tests to the Defendant. He concluded that the Defendant suffers from a very severe borderline personality disorder and exhibits signs of cannabis dependence and inhalant abuse. He testified that the Defendant is not so dysfunctional that she needs to be institutionalized but that she has a multiplicity of problems in interpersonal relationships, in controlling her behavior, and in achieving vocational and academic goals. He stated that the battery of tests administered to the Defendant indicated that she is an extremely intelligent young woman.

Dr. Engum stated that it was his opinion that the Defendant did not act with deliberation or premeditation in killing Slemmer, but had acted in a manner consistent with his diagnosis of borderline personality disorder; she lost control. He explained that she had danced around when relating the event to another person because of the emotional release she experienced from having assured through the killing of Slemmer that she could maintain her relationship with Shipp. When questioned about the piece of skull found in the Defendant's coat, Dr.

Engum explained that the Defendant actually has no identity and the action of taking and showing a piece of Slemmer's skull to friends was her way of getting recognition, "no matter how distorted" that recognition was.

On cross-examination, Dr. Engum stated that there was no question that the Defendant had killed Slemmer. He reiterated that it was his opinion that once the attack began, the Defendant literally lost control. However, Dr. Engum admitted that it had been a deliberate act to entice Slemmer to the park to beat her. He admitted that carving a pentagram on Slemmer's chest and bashing her head had been a deliberate act. He recognized that the Defendant had time to calm down when she left Slemmer to see if anyone was around. He also conceded that the weapons the Defendant carried with her and used in the attack might indicate that she had intended to kill the victim.

William Bernet, medical director of the psychiatric hospital at Vanderbilt University, testified that he had reviewed the statement of the Defendant and Kimberly Iloilo and the reports of Dr Engum, Dr. Elkins and Dr. Marks. He concluded that although there were satanic elements in this crime, the pattern was that of an adolescent dabbling in Satanism. He then described a pattern known as the phenomenon of collective aggression, whereby a group of people gather and become emotionally aroused and the end result is that they engage in some kind of violent behavior. On cross-examination, Dr. Bernet admitted that he had spoken neither with the Defendant nor any of the witnesses.

Based on this evidence in the guilt phase, the jury found the Defendant, Christa Gail Pike, guilty of first degree murder and conspiracy to commit first degree murder.

In the sentencing phase of the trial, the State relied on the evidence presented at the guilt phase and presented no further proof. In mitigation, Carrie Ross, the Defendant's aunt, testified that the Defendant had experienced no maternal bonding because she was premature and was raised by her paternal grandmother until she died in 1988. Ross stated that the Defendant was shuffled between her mother and father and that the Defendant's mother set no rules for her. She testified that on the occasions that the Defendant had visited her house, she behaved as a "little girl," playing Barbie and dress-up with her eleven-year-old cousin. On cross-examination, however, Ms. Ross admitted that she had previously described the Defendant as a pathological liar and had been afraid to have the Defendant around her own children. She admitted saying that the Defendant had been out of control since she was twelve-years old.

Glenn Pike, the Defendant's father, testified that he had kicked the Defendant out of his house in 1989 and that he had signed adoption papers for her prior to her eighteenth birthday. On cross-examination, he admitted that in 1989, there had been an allegation that the Defendant had abused his two-year-old daughter by a second wife. He stated that he was unable to make the Defendant do her schoolwork and that she had always lied and been manipulative.

The Defendant's mother, Carissa Hansen, a licensed practical nurse, testified that the Defendant had lived with her 95% of the time since her grandmother's death. She admitted smoking marijuana with the Defendant in order to "establish a friendship." She related that the Defendant had taken an overdose shortly after the death of her paternal grandmother. Hansen also

testified that one of her boyfriends had whipped the Defendant with a belt and that she had the boyfriend arrested.

On cross-examination, Ms. Hansen admitted that the Defendant had been a problem for ten years. She admitted that the Defendant had pulled a "butcher-knife" on the previously mentioned boyfriend. She testified that the Defendant had lied to her and stolen from her on numerous occasions and had quit high school. She stated that she had no control over the Defendant since she was eight years old. Following Ms. Hansen's testimony, the defense rested.

As rebuttal proof, Harold James Underwood, Jr., a University of Tennessee police officer, testified that on January 13, 1995, he was assigned to secure the murder scene in this case. He testified that the Defendant came to the scene at approximately 4:00 p.m. and asked him why the area had been marked off. She then questioned him concerning the identity of the victim and whether or not the police had any suspects. Underwood testified that the Defendant seemed amused as she was giggling and moving around.

Based on the proof, the jury found the existence of the following two aggravating circumstances beyond a reasonable doubt: (1) That the murder was extremely heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death; and (2) that the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the Defendant or another. Tenn. Code Ann. § 39-13-204(i)(5) and (6). In addition, the jury found that the State had proven beyond a reasonable doubt that the aggravating circumstances outweighed any mitigating circumstances and as a result, sentenced the Defendant to death.

# TRIAL ERRORS

## A. Sufficiency of the Proof

-15-

The Defendant argues that the State did not prove every element of the offenses of first degree murder and conspiracy to commit first degree murder beyond a reasonable doubt. Specifically, in regard to the first degree murder conviction, the Defendant argues that the State did not introduce any evidence relating to deliberation or of the Defendant having the opportunity to reflect upon her actions after "the mind was free from the influence of excitement or passion." She argues that there was no proof outside of the uncorroborated statement of the Defendant that Shadolla Peterson or Tadaryl Shipp participated in the murder so as to warrant the conviction of conspiracy to commit first degree murder. The Defendant also maintains that the proof was insufficient to justify the jury's sentence of death and that the jury failed to properly consider and weigh the mitigating factors against the aggravating factors.

When an accused challenges the sufficiency of the convicting evidence, we must review the evidence in the light most favorable to the prosecution in determining whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). We do not reweigh or re-evaluate the evidence and are required to afford the state the strongest legitimate view of the proof contained in the record as well as all reasonable and legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Questions concerning the credibility of witnesses, the weight and value to be given to the evidence, as well as factual issues raised by the evidence are resolved by the trier of fact, not this court. Cabbage, 571 S.W.2d at 835. A guilty verdict rendered by the jury and approved by the trial judge accredits the testimony of the witnesses for the state, and a presumption of guilt replaces the presumption of innocence. State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

An appellant challenging the sufficiency of the proof has the burden of illustrating to this court why the evidence is insufficient to support the verdict returned by the trier of fact in his or her case. This court will not disturb a verdict of guilt for lack of sufficient evidence unless the facts contained in the record and any inferences which may be drawn from the facts are insufficient, as a matter of law, for a rational trier of fact to find the appellant guilty beyond a reasonable doubt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Tennessee Code Annotated sections 39-13-201(a) and -201(b) provide that a deliberate act is "one performed with a cool purpose" and a premeditated act is "one done after the exercise of reflection and judgment." The existence of premeditation and deliberation is a question of fact that may be inferred from the manner and circumstances of the homicide. State v. Tune, 872 S.W.2d 922, 925 (Tenn. Crim. App. 1993). In Tune, this Court held that "[w]hile willful killing with a deadly weapon is not sufficient by itself to support an inference of premeditation, there were other circumstances before the jurors from which they could infer the existence of both premeditation and deliberation in this Defendant's mind." Id.

In the light most favorable to the State, the evidence reflects that the Defendant told a friend the day before the killing that she was going to kill the victim. Also, during the killing, the Defendant made repeated attacks on the victim over a period of time in which she could have reflected upon her actions, especially when she left the victim to see if anyone else was around. By the Defendant's own statement, the reason for killing the victim was to assure that the victim could not testify against her for "attempted murder." And finally, the Defendant's own expert admitted that the act of carrying a box cutter and meat cleaver was a deliberate act. We are satisfied that the evidence in this case was sufficient to establish the elements of premeditation and deliberation so as to warrant the jury's verdict in the first degree murder conviction.

In regard to the conspiracy to commit first degree murder conviction, the Defendant maintains that there was no proof beyond her "uncorroborated statement" that a box cutter had been used on the victim or that others had attacked the victim with cutting instruments. In her statement to the police, the Defendant related that others were with her when the killing took place. She also stated that a person referred to as "he" had participated in the torture of the victim and that this person had brought a miniature meat cleaver with him that evening.

The essence of conspiracy has always been an agreement to commit a crime. State v. Hodgkinson, 778 S.W.2d 54, 58 (Tenn. Crim. App. 1989). A conspiracy requires a knowing involvement. However, no formal or expressed agreement is necessary and the agreement may be proved by circumstantial evidence. State v. Shropshire, 874 S.W.2d 634, 641 (Tenn. Crim. App. 1993). "The unlawful confederation may be established by circumstantial evidence and the conduct of the parties in the execution of the criminal enterprise. Conspiracy

implies concert of design and not participation in every detail of execution." Randolph v. State, 570 S.W.2d 869, 871 (Tenn. Crim. App. 1978). A confession may sustain a conviction where there is other evidence sufficient to show the commission of a crime by someone. Franklin v. State, 513 S.W.2d 146, 151 (Tenn. Crim. App. 1974).

In this case there was a confession by the Defendant that she and another person referred to as "he" accompanied the victim to Tyson Park. Both the Defendant and another person participated in dragging the victim to a more isolated location and mutilating the victim with a box cutter and a meat cleaver. A witness testified that the Defendant stated she was going to kill the victim the day before the murder. A witness testified that the Defendant, Tadaryl Shipp and Shadolla Peterson left with the victim and returned together later that evening without the victim. DNA testing of the Defendant's and Shipp's clothing revealed blood stains matching that of the victim's. Both the Defendant and Shipp wore pentagram necklaces and a "Satanic Bible" was recovered from a search of Shipp's room. The Defendant admitted that she and the other person carved the pentagram in the victim's chest. The Defendant contends that the proof was insufficient to demonstrate that she possessed the requisite reflection to support the conviction for conspiracy to commit first-degree murder. Yet, there is ample circumstantial evidence that the Defendant and Shipp deliberately planned and executed the killing.

Finally, the Defendant contends that the proof was insufficient to justify the jury's sentence of death and that the jury failed to properly consider and weigh the mitigating factors against the aggravating factors. However, the record

reveals that the application of both of the aggravating factors was supported by evidence.

The jury found that the aggravating circumstance that the murder was especially "heinous, atrocious or cruel" was applicable in this case. The medical examiner testified that there were so many wounds on the victim's body they could not be cataloged. The victim's throat had been slashed repeatedly, defensive wounds were on her right arm, and at least four heavy blows had been administered to her head. A pentagram had been carved in her chest. The medical examiner repeatedly testified that all of the wounds prior to the final blow to the head had been made while the victim was alive and conscious. We conclude that the record amply supports application of this aggravator.

The jury also found that the aggravating circumstance that the murder was committed for the purpose of "avoiding, interfering with or preventing a lawful arrest" was applicable. The Defendant, herself, told officers that as the victim continued to beg for her life, she told the victim that she was not going to be "rotting in jail because of [her] stupid ass." She also stated that a voice kept telling her that she would go to prison for attempted murder if she let the victim go. We conclude that there was ample evidence to support the application of this aggravator.

The mitigating circumstances offered to the jury were that the Defendant had no significant history of prior criminal activity, that the murder was committed while the Defendant was under the influence of extreme mental or emotional disturbance, that the Defendant was young, that the capacity of the Defendant to appreciate the wrongfulness of her conduct or to conform her conduct to the

requirements of the law was substantially impaired as a result of mental disease or intoxication, and any other mitigating factor that was raised by the evidence. The Defendant argued that her difficult childhood should also be considered as mitigation.

Again, in reviewing the evidence in the light most favorable to the State, a rational juror could have concluded that the applicable aggravating circumstances outweighed the mitigating factors. Therefore, we conclude that the sentence of death was supported by the evidence.

## B. Media Coverage

The Defendant argues that the trial court erred by refusing to grant her motion to deny television coverage of the pretrial proceedings. The Defendant asserts that media coverage in the case made jury selection difficult, but the Defendant presents no proof that a juror was biased because of the coverage. The Defendant also asserts that the cameras in the courtroom "arguably affected witness testimony and was generally disruptive of the proceedings," but again, the Defendant cites no specific instances to justify this conclusion.

Supreme Court Rule 30 provides for in-court media coverage at trial proceedings.[1] Coverage is subject, at all times, to the authority of the judge to "(i) control the conduct of the proceedings before the court; (ii) maintain decorum and prevent distraction; (iii) guarantee the safety of any party, witness, or juror; and (iv) ensure the fair and impartial administration of justice." Rule 30(A)(1),

---

[1]Tennessee Supreme Court Rule 30 became effective January 1, 1996, and was a one year pilot project which was to expire on December 31, 1996. However, on December 30, 1996, the rule, as amended, was made permanent.

(D)(2). Further, Rule 30 (D)(2) allows the trial court, upon a proper showing, to limit in-court media coverage in order to accommodate any of these important interests.

This Court has held that Rule 30 presumptively entitles the media to in-court camera coverage. State v. Freddie Morrow, C.C.A. No. 01C01-9601-CC-00022, Robertson County (Tenn. Crim. App., Nashville, Apr. 12, 1996). Given this presumption, any finding that such coverage should be denied, limited, suspended, or terminated must be supported by substantial evidence that at least one of the four interests in Rule 30(A)(1) and (D)(2) is of concern in the case before the court. The burden of proof in producing this evidence is on the party seeking limits on media coverage.

In the present case, the record before the court reflects only the general statement of counsel that pretrial media coverage would make jury selection difficult and would deprive the Defendant of a fair trial because it "arguably affected witness testimony and was generally disruptive of the proceedings." There is no evidence to substantiate the Defendant's claims. Although jury selection was lengthy, there is no assertion that any particular juror was biased because of the media coverage. The Defendant provides no proof that testimony was affected or that the proceedings were disrupted. We cannot, therefore, conclude that the trial court abused its discretion in failing to exclude pretrial media coverage.

### C. Change of Venue

The Defendant argues that the trial court erred by failing to grant her motion for a change of venue. She maintains that a majority of prospective jurors

admitted that they had heard detailed information about the case. The Defendant cites the United States Supreme Court decision in Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), in support of the proposition that a change of venue should be granted if extensive pretrial publicity was such that the court should presume the jury is tainted even if prospective jurors stated that they would be able to set aside what they had seen or heard.

However, in Dowd, jury selection lasted more than four weeks. Also the Supreme Court specifically stated that due to "swift, widespread and diverse methods of communication," it is not required that jurors be totally ignorant of the facts and issues involved. 366 U.S. at 722, 81 S.Ct. at 1642. The court also stated that "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." 366 U.S. at 723, 81 S.Ct. at 1643. In Dowd, the panel consisted of 430 persons. The court itself excused 268 of those persons due to their fixed opinions of guilt, and 103 were excused because of their conscientious objection to the death penalty. 366 U.S. at 727, 81 S.Ct. at 1645. The *voir dire* record indicated that 370 of the prospective jurors entertained some opinion as to guilt, ranging from mere suspicion to absolute certainty. Of the twelve jurors selected, eight thought the Defendant was guilty. Id.

In the present case, although many potential jurors had indicated that they had heard something about the case in the media, every juror who said he or she was familiar with the case said that he or she could disregard the reports and render an impartial decision. All potential jurors who said they could not disregard the reports were excused for cause. The Defendant has cited no specific response from any seated juror that was troublesome.

## D. Excusal of Jurors

The Defendant asserts that the trial court impanelled a jury that was pro-death penalty and improperly excused for cause those prospective jurors that indicated that they were opposed to the death penalty. The Defendant suggests that the trial court erred in denying her proposal that a "don't ask, don't tell," procedure be used whereby jurors would not be required to tell the court about their personal feelings about the death penalty.

In Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985), the United State Supreme Court reaffirmed as the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment the test of "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" In State v. Alley, 776 S.W.2d 506, 518 (Tenn. 1989), cert. denied, 493 U.S. 1037, 110 S.Ct. 758 (1990), the Tennessee Supreme Court held that "the trial court's finding of the bias of a juror because of his views of capital punishment shall be accorded a presumption of correctness and the burden shall rest upon the Defendant to establish by convincing evidence that that determination was erroneous."

The Defendant notes that in the present case the trial court examined prospective jurors extensively regarding their thoughts about the death penalty and allowed counsel to examine those who indicated that they had a problem with the death penalty in an effort to rehabilitate them. The Defendant cites no prospective juror who was excluded that should not have been. Applying the

standard as set forth in <u>Alley</u>, the Defendant has failed to establish by convincing evidence that the court's actions were erroneous. This issue is without merit.

## E. Use of the Skull as Evidence

The Defendant next complains that pursuant to Rule 403 of the Tennessee Rules of Evidence, the skull of the victim should have been excluded because its probative value was substantially outweighed by its prejudicial effect. The Defendant asserts that the skull was also cumulative evidence because prior to its admission, numerous photographs of the skull were admitted to show the damage to the victim's head.

The State argues that the introduction of the skull was an important portion of the medical testimony. The medical examiner testified that she had sent the skull to a forensic anthropologist to be reconstructed because she could not tell exactly what had happened without the reconstruction. The skull was used by the medical examiner to show the amount of force that was applied to it, as well as the weapon that was used. Pieces of asphalt were embedded in the skull.

In this case, the skull had been thoroughly cleansed and was no more prejudicial or gruesome than a model diagram would have been. Dr. Elkins, the medical examiner, testified that the reconstructed skull would illustrate to the jury what had occurred to the victim and demonstrate the amount of force that was applied as well as the type of weapon used to inflict the head injuries. There is no question that the nature and type of injuries sustained by the deceased and the manner in which death occurred were relevant considerations by the jury. Moreover, the skull was used to illustrate that the piece of skull found in the

Defendant's jacket fit perfectly into the reconstructed skull. The skull was, therefore, highly relevant in establishing the circumstances surrounding the offense. See State v. Cazes, 875 S.W.2d 253, 263 (Tenn. 1994); cert. denied, 115 S.Ct. 743, 130 L.Ed2d 644 (1995); State v. Morris, 641 S.W.2d 883, 888 (Tenn. 1982). This issue is without merit.

### F. Cruel and Unusual Punishment

The Defendant contends that the punishment imposed upon her, death by electrocution, is cruel and unusual punishment under the state and federal constitutions. However, this issue has been previously decided by the Tennessee Supreme Court and determined to be without merit. See State v. Cazes, 875 S.W.2d 253 (Tenn. 1994); State v. Howell, 868 S.W.2d 238 (Tenn. 1993); State v. Black, 815 S.W.2d 166 (Tenn. 1991).

### G. Peremptory Challenges

The Defendant contends that at the time of the offense, the rules in effect gave the Defendant fifteen (15) peremptory challenges compared to the State's eight. See Rule 24(d), Tenn. R. Crim. P. (1995). However, at the time of trial, the rules had been changed to give an equal number of peremptory challenges to both the Defendant and the State. See Rule 24(d), Tenn. R. Crim. P. (1996). The Defendant argues that application of the new rule violated the *ex post facto* provision of the Tennessee Constitution which requires that rules not be applied to events which occurred prior to their enactment.

The term "ex post facto" as used in Article I, § 10, cl. 1, of the U.S. Constitution, provides that "[n]o state shall ... pass any ... ex post facto law." The

Tennessee Constitution's ex post facto prohibition found in Article I, § 11, provides:

> That laws made for the punishment of acts committed previous to the existence of such laws, and by them only declared criminal are contrary to the principles of a free Government; wherefore no Ex post facto law shall be made.

Two critical elements must be present for a law to fall within the prohibition. First, it "must be retrospective, that is, it must apply to events occurring before its enactment"; and second, "it must disadvantage the offender affected by it." Miller v. Florida, 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987) (quoting Weaver v. Graham, 450 U.S. 24, 29, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981)); State v. Ricci, 914 S.W.2d 475, 480 (Tenn. 1996). Furthermore, Tennessee Code Annotated section 39-11-112 provides that:

> whenever any penal statute or penal legislative act of the state is repealed or amended by a subsequent legislative act, any offense, as defined by the statute or act being repealed or amended, committed while such statute or act was in full force an effect shall be prosecuted under the act or statute in effect at the time of the commission of the offense.

Yet, the United States Supreme Court has held that laws which change a rule of evidence, but which do not increase the punishment nor change the elements of the offense or the ultimate facts necessary to establish guilt, but only remove existing restrictions on the competency of certain classes of evidence or of persons as witnesses do not constitute ex post facto laws. State v. Bragan, 920 S.W.2d 227, 241 (Tenn. Crim. App. 1995) (citations omitted). In Dobbert v. Florida, 432 U.S. 282, 293, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), the Supreme Court held that the prohibition of ex post facto laws does not extend to every change of law that "may work to the disadvantage of a defendant." Instead, it is intended to secure "substantive personal rights" from retroactive deprivation and

does not "limit the legislative control of remedies and modes of procedure which do not affect matters of substance."  Id.  Thus, laws which change rules of procedure but which do not affect any substantial right of a defendant are not ex post facto laws.

Here, it is apparent that the trial court applied a procedural rule that had been amended after the commission of the crimes in question.  The Defendant also claims that the right to a fair and impartial jury was impaired by the increase in peremptory challenges for the State.  However, the Defendant has not proffered any evidence that the jury, as it was composed by the State's using the additional peremptory challenges, prevented her from receiving a fair trial. Absent proof that the Defendant was disadvantaged or that a substantive right was impaired by the amended procedural rule, we cannot conclude that an ex post facto violation occurred.  This issue is without merit.

**H.  Sentencing on the Conspiracy Conviction**

The Defendant argues that the trial court erred in sentencing the Defendant to a consecutive sentence of twenty-five (25) years for the conviction of conspiracy to commit first-degree murder. The Defendant complains that the trial court inappropriately used the aggravating circumstance that the crime was especially cruel to sentence her to the maximum sentence.  She further complains that the trial court erred in determining that she was a dangerous offender and ordering her to serve the sentence consecutively to the death sentence.

When an accused challenges the length, range, or the manner of service of a sentence, this court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In conducting a de novo review of a sentence, this court must consider: (a) the evidence, if any, received at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) any statutory mitigating or enhancement factors; (f) any statement that the Defendant made on his own behalf; and (g) the potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. § § 40-35-102, 1-103, and -210; see State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

If our review reflects that the trial court followed the statutory sentencing procedure, imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings are adequately supported by the record, then we may not modify the sentence even if we would have preferred a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

At the sentencing hearing, the State called as its only witness Officer Debbie Wade, a Corrections Officer with the Knox County Sheriff's Department. She testified that on the day the Defendant was sentenced to die, she gave

Officer Wade a letter and requested that it be passed to her co-Defendant, Tadaryl Shipp. Officer Wade gave the letter to her lieutenant and was told not to pass it to Mr. Shipp. The letter was introduced into evidence and read as follows:

> Tadaryl, hey, love, I just wanted you to know how much I love you. I have ten months to live. Imagine that. I would spend every moment with you if I could, baby. I want to tell you to tell them you lied in your statement and go along with mine. Do you have a copy of mine? If not, I'll give you one. Okay? I love you big bunches, baby, and no matter what they do to me they can't change what's in my heart. Please write me. I miss you so much. You see what I got for trying to be nice to that whore. I went ahead and bashed her brains out so she would die quickly instead of letting her bleed to death and suffer more and they fuckin fry me. Ain't that some shit. Please write and tell me what you're feeling. Baker said he would give you some paper and shit while you are out there. Also tell your lawyer if he wants me to I'll testify, testify for you, I will. Love you for the rest of my life. Little devil.

The trial court classified the Defendant as a Range I, standard offender on the conviction for conspiracy to commit first degree murder. The trial court also considered several enhancement and mitigating factors in setting the sentence above the minimum presumptive sentence of fifteen (15) years. First, the trial court applied enhancement factor number (2), that "[t]he Defendant was a leader in the commission of an offense involving two (2) or more criminal actors." Tenn. Code Ann. § 40-35-114(2). The trial judge then stated that factor number (5), that "[t]he Defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense," would not be relied upon heavily because it had already been used in sentencing the Defendant to death on the other count. Tenn. Code Ann. § 40-35-114(5). Factor number (7), that "[t]he offense involved a victim and was committed to gratify the Defendant's desire for pleasure and excitement," factor number (9), that "[t]he Defendant possessed or

employed a firearm, explosive device or other deadly weapon during the commission of the offense," and factor number (10), that "[t]he Defendant had no hesitation about committing a crime when the risk to human life was high," were also found to be applicable. Tenn. Code Ann. §§ 40-35-114 (7),(9), and (10). The trial court found that no mitigating factors were applicable.

We find error with only one of the trial court's applications of enhancement factors. The trial judge held that the Defendant had no hesitation about committing a crime when the risk to human life was high. Tenn. Code Ann. § 40-35-114(10). We believe that the court improperly applied this enhancement factor. Enhancement factor (10) refers to the defendant having "no hesitation about committing a crime when the risk to human life is high." This Court has previously recognized that factors which are inherent in a particular offense, even if not designated as an element, should not be given substantive weight in increasing a sentence. See, e.g., State v. Scott, 735 S.W.2d 825, 830 (Tenn. Crim. App. 1987). We conclude that the risk to human life is inherent in the grading of the offense of conspiracy to commit first-degree murder. According to Tennessee Code Annotated section 39-12-107, "conspiracy is an offense one (1) classification lower than the most serious offense that is the object of the conspiracy." First-degree murder is classified as a capital offense, therefore conspiracy to commit first-degree murder is a Class A felony, a class reserved for only the most serious offenses.

Moreover, the indictment contains allegations in support of the element of conspiracy that an overt act be taken, that the Defendant and two others left the Job Corps center, took the victim to an isolated location and attacked her with a box cutter. Not only is the risk to human life inherent in the offense, in the case

<u>sub judice</u>, high risk acts were included in the indictment as charged in support of an element of the crime. <u>See</u> Tenn. Code Ann. § 39-12-103(a), (d). Enhancement factors may be applied "if not themselves essential elements of the offense as charged in the indictment." Tenn. Code Ann. § 40-35-114. For both of these reasons, we conclude that enhancement factor should not have been applied.

The evidence produced at trial, including the Defendant's own statement, and the letter introduced at the sentencing hearing would certainly support the factor that she was a leader in the commission of the offense. The statement of the Defendant, the testimony concerning her recounting of the incident to others, the fact that she carried a piece of the victim's skull as a souvenir, and her return to the scene were evidence of her desire for excitement and pleasure. Again, by her own statement, the Defendant admitted carrying a deadly weapon.

Although we disagree with the trial court's finding that the Defendant's age and lack of a significant history of prior criminal activities were not applicable mitigating factors, we cannot conclude that the trial court erred in sentencing the Defendant to the maximum sentence of twenty-five (25) years. Clearly, when the applicable enhancing factors are weighed against the mitigating factors, the record supports the trial court's sentence.

The trial court found that consecutive sentences were warranted because the Defendant is a dangerous offender whose behavior indicates little or no regard for human life and had no hesitation about committing a crime in which the risk to human life was high. <u>See</u> <u>State v. Wilkerson</u>, 905 S.W.2d 933, 937-39 (Tenn. 1995). Again, given the circumstances surrounding this offense,

especially the heinous nature of the crime and the fact that the Defendant showed no remorse, we conclude that the Defendant met the criteria for consecutive sentencing and the trial court did not abuse her discretion in ordering such. The sentencing issues raised by the Defendant are without merit.

## CONCLUSION

Upon careful review of the record, we conclude that the Defendant has offered no grounds that warrant relief from her convictions of premeditated first degree murder and conspiracy to commit first degree murder. Moreover, we conclude that the Defendant has failed to establish any ground warranting relief from the sentence of death and the consecutive sentence of twenty-five (25) years.

Therefore, after a thorough review of the issues and the record before us as mandated by Tennessee Code Annotated section 39-13-206(b) and (c), and for the reasons stated herein, we affirm the appellant's sentence of death. We conclude that the sentence was not imposed in an arbitrary fashion, the evidence supports the jury's finding of the aggravating circumstances, and the evidence supports the jury's finding that the aggravating circumstances outweigh any mitigating circumstances. Moreover, a comparative proportionality review, considering both the circumstances of the crime and the nature of the appellant, convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.

Accordingly, the judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE

CONCUR:

_____
THOMAS T. WOODALL, JUDGE

_____
JOHN K. BYERS, SENIOR JUDGE